**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

AMERICAN SUSTAINABLE BUSINESS
COUNCIL,

*Plaintiff*,

v.

GLENN HEGAR, in his official capacity as
Texas Comptroller of Public Accounts; and
KEN PAXTON, in his official capacity as
Attorney General of Texas,

*Defendants.*

Civil Action No. 1-24-CV-1010

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff American Sustainable Business Council sues Defendants Glenn Hegar, in his

official capacity as Texas Comptroller of Public Accounts ("Comptroller"), and Ken Paxton, in

his official capacity as Attorney General of Texas, and alleges as follows:

1.      This is a complaint for declaratory and injunctive relief under 42 U.S.C. § 1983 for

violations of the First and Fourteenth Amendments to the United States Constitution. Plaintiff

American Sustainable Business Council challenges Texas Senate Bill 13 ("SB 13"), which bars

state public entities from investing and contracting with companies on the basis of the companies'

actual or perceived political views regarding fossil fuels.

2.      Texas has long presented itself as a business-friendly state where limited state regulation

facilitates the ability of businesses to conduct themselves as they see fit. According to the State's

website, "Texas offers companies of all sizes and all industries one of the best business climates

in the nation, with a fair, transparent tax and regulatory structure designed for businesses to succeed."[1]

3.       Yet in 2021, the Legislature passed SB 13 to coerce and punish businesses that have articulated, publicized, or achieved goals to reduce reliance on fossil fuels. Set forth with the stated intent of stopping a "movement" that is "denying capital to [Texas's] responsible, hard-working energy businesses,"[2] SB 13 is tailored to help neither Texas businesses specifically nor energy businesses generally. Its impact on the State has been negative. According to a recent study conducted for the Texas Association of Business, SB 13 and a companion law related to firearms cost Texans approximately $668 million in lost economic activity and 3,034 fewer jobs in the 2022–2023 fiscal year, as well as reduced competition and directly increased State entities' costs for banking, investment, and finance by approximately $270 million.[3]

4.       SB 13 bars certain state investments and contracts with companies that take "any action" that is intended to penalize, harm, or simply limit commercial relations with fossil fuel companies and companies that rely on fossil fuels. The sweep of this provision is contrary to the First Amendment, which protects speech and other expressive activities, even if a government does not like the content of that expression. Thus, SB 13 should be declared unconstitutional and unenforceable because it impermissibly infringes rights of free speech and association under a

---

[1] Texas Econ. Dev. & Tourism, Business Climate, https://gov.texas.gov/business/page/business-climate (last visited June 26, 2024).

[2] 2021 TX S.B. 13 (NS), Texas Committee Report, Title: Relating to contracts with and investments in companies that boycott certain energy companies. (Mar. 11, 2021).

[3] TXP, Inc., *The Potential Economic and Tax Revenue Impact of Texas' Fair Access Laws* (Winter 2024), https://cb9cdd3c-61f1-494f-94da-c77c057de62c.usrfiles.com/ugd/cb9cdd_3abaf3cce79c4dc4a23ec1bc6d3a4ad0.pdf (TXP conducted the study on behalf of the Texas Association of Business).

scheme of politicized viewpoint discrimination, based on no legitimate state interest. Indeed, viewpoint and content-based discrimination are the only clear through-lines in the Comptroller's enforcement of the statute.

5.     Delving deeper into the drafting and mechanics of the law, however, there are additional reasons to find it unenforceable. Key terms related to violations and compliance are undefined and vague. And, despite putting companies on a public blacklist, SB 13 does not give regulated entities adequate notice of their prospective exclusion from competition for state investments and contracts and gives them no meaningful opportunity to contest their placement on these blacklists.

6.     SB 13 has injured the members of the American Sustainable Business Council ("ASBC"), an organization founded to inform, connect, and mobilize business leaders and investors to transform the public and private sectors toward a just and sustainable economy. Among ASBC's many projects are efforts to encourage sustainable investing and sustainable business practices. These are all cornerstones of the modern Texas economy. Yet, SB 13 takes aim at, and punishes, companies that speak about, aspire to, and achieve this goal.

## SUMMARY OF CLAIMS

7.     In June 2021, the Texas Governor signed SB 13 into law, codified at Tex. Gov't Code §§ 809.001 *et seq.* and Tex. Gov't Code §§ 2276.001 *et seq.* ("SB 13"), and the law took effect on September 1, 2021. SB 13 contains two key provisions. First, it prohibits certain state entities from investing in, and requires them to divest from, financial companies that "boycott energy companies." *Id.* §§ 809.053(d), 809.057 (the "Divestment Provision"). Second, SB 13 generally prohibits a governmental entity (including counties, cities, public retirement funds, schools, *etc.*) from contracting with a company for goods or services unless the company confirms in writing that it does not "boycott energy companies." *Id.* § 2276.002(b) (the "Procurement Provision").

8.      SB 13 defines "boycott energy company" broadly to mean:

without an ordinary business purpose, refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company because the company:

(A) engages in the exploration, production, utilization, transportation, sale, or manufacturing of fossil fuel-based energy and does not commit or pledge to meet environmental standards beyond applicable federal and state law; or

(B) does business with a company described by Paragraph (A).

*Id.* § 809.001(1).

9.      This definition establishes a viewpoint that is disfavored ("boycotting" fossil fuel companies) and attaches punishment to conduct that expresses that viewpoint, including pure expressions of speech and association on a matter of public concern ("any action . . . intended to penalize, inflict economic harm on, or limit commercial relations with" a fossil fuel company).

10.     The First Amendment prohibits states from restricting expression on the basis of content or viewpoint. This constitutional prohibition of viewpoint and content discrimination applies to states' awards of government contracts or other benefits. SB 13's definition of "boycott energy company" reaches protected expression and violates the First Amendment because, on its face and as interpreted and applied by the Comptroller, it discriminates against financial companies and would-be government contractors on the basis of the content and viewpoint of their speech.

11.     Texas has repeatedly confirmed that SB 13, facially and as applied, is viewpoint- and content-discriminatory.

12.     Defendant Comptroller Hegar, who is directed to prepare a list of financial companies that "boycott" fossil fuels (the "blacklist") under SB 13, has on numerous occasions described his efforts, and the State's, as viewpoint and content-based discrimination. Indeed, when releasing the

blacklist, the Comptroller announced that Texas is using SB 13 to punish companies that "engage in anti–oil and gas rhetoric."[4] That is unconstitutional.

13.     By its terms and as interpreted and applied by the Comptroller, SB 13 also violates the First Amendment right to freedom of association. The Comptroller has stated that companies can be removed from the blacklist if they discontinue their membership in associations, including the Net Zero Asset Managers Initiative, Climate Action 100, or the Net Zero Banking Alliance, that advocate for sustainable investing, sustainable manufacturing, products or services, or addressing climate change.

14.     Texas's Attorney General, Ken Paxton, similarly released an advisory in October 2023 stating that governmental entities are not free to do business with "energy company boycotters" and that governmental entities must take notice of "whether the company is a member of the Net Zero Alliance or a signatory of any other similar entity that espouses a commitment to the furtherance of so-called Environmental, Social and Governance policies."[5]

15.     While prohibiting certain speech, SB 13 unconstitutionally compels other speech by requiring companies to verify agreement with Texas's preferred position regarding fossil fuels as a condition of managing investments for or contracting with state entities. It is unconstitutional for a state to condition a benefit, such as a contract or investment, on the recipient's agreement to restrict their constitutionally protected association with others.

---

[4] *See* Texas Comptroller of Public Accounts, *Texas Comptroller Glenn Hegar Announces List of Financial Companies that Boycott Energy Companies* (Aug. 24, 2022), https://web.archive.org/web/20221110022847/https://comptroller.texas.gov/about/media-center/news/20220824-texas-comptroller-glenn-hegar-announces-list-of-financial-companies-that-boycott-energy-companies-1661267815099.

[5] Attorney General of Texas, Advisory on Texas Laws Prohibiting Contracts and Investments with Entities that Discriminate Against Firearm Entities or Boycott Energy Companies or Israel, at 5 (Oct. 18, 2023).

16.     In addition to these infringements on core constitutional rights, SB 13 is unconstitutionally vague under the Fourteenth Amendment because it encourages arbitrary enforcement and fails to give regulated entities fair notice of prohibited conduct. While stating that "any action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company" in the fossil fuel industry will be construed as a "boycott," the statute leaves the sweeping scope of this provision undefined. Moreover, the statute fails to establish how "boycotting" shall be identified and evaluated. It gives unlimited discretion to the Comptroller to both rely upon any publicly available information to make his determinations *and* to accept or reject information supplied by the companies that the Comptroller has identified as boycotters.

17.     Whatever standards the Comptroller has applied to determine whether a financial company is "boycotting" fossil fuel companies—*i.e.* "without an ordinary business purpose, refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with"[6]—appear to be arbitrary. Many companies informed the Comptroller that they employed climate-related investing principles for one or more ordinary business purposes. The Comptroller nevertheless listed some, but not all, of these companies on the blacklist. The Comptroller has also blacklisted entities *holding large stakes in fossil fuel companies* because those entities express support for sustainable climate goals. It is clear the Comptroller is committed to punishing voices that are opposed to fossil fuel reliance.

18.     ASBC is a membership-based organization of companies, investors, and business organizations that represents, collectively, more than 200,000 businesses. ASBC advances sustainable business practices and advocates for policies that support sustainable manufacturing,

---

[6] Tex. Gov't Code § 809.001(1).

products, and services. It seeks to amplify the voice of sustainable businesses at the national and state levels. ASBC's members have been harmed by SB 13's targeting of actual and perceived expression regarding fossil fuels. The Comptroller placed the flagship investment funds of two ASBC members, Etho Capital LLC ("Etho Capital") and Our Sphere, Inc. ("Sphere"), on a blacklist based upon the Comptroller's consideration of protected speech and application of vague and arbitrary standards. Other members cannot contract with state entities given SB 13's verification requirements and vague, overbroad language.

19.     ASBC members Etho Capital and Sphere are companies that create investment funds that they market to investors, including retirement plans. The Comptroller has included funds created by Etho Capital and Sphere on the blacklist. As a result, neither investment company can compete for investments from the Texas entities subject to the Divestment Provision.

20.     The Comptroller did not provide targeted companies like these ASBC members with meaningful process. The Comptroller did not provide any of the alleged research or materials it used to place the Etho Capital and Sphere funds on the blacklist, did not provide an explanation regarding why the funds were placed on the blacklist, and did not provide any clear, meaningful process for contesting these listings.

21.     SB 13 also prevents ASBC's members from contracting with state entities unless they sign a verification that they do not "boycott energy companies."[7]

22.     While SB 13 is in effect, ASBC members like Etho Capital, Sphere, and others are unable to compete for business with Texas entities solely due to the content and viewpoint of their speech and the associations they choose to make. The law also denies them any avenue for challenging their exclusion from this major market. The defects of overbreadth, vagueness and lack of due

---

[7] Tex. Gov't Code § 2276.002(b).

process written into SB 13 limit the constitutional rights of countless other businesses. For these reasons, the Court should declare SB 13 unlawful and permanently enjoin Defendants from enforcing it.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, and under 28 U.S.C. §§ 1343(a)(3) and (a)(4) because Plaintiff seeks to vindicate its federal civil rights under 42 U.S.C. § 1983.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the district.

## PARTIES

25.     Plaintiff ASBC is a national association of individual businesses, investment companies, and other business associations. ASBC was incorporated in Delaware in 2011. Its mission is to inform, connect, and mobilize business leaders and investors to transform the public and private sectors toward a just and sustainable economy. To that end, ASBC develops and advocates solutions for policymakers, business leaders, and investors that support an equitable and regenerative economy that benefits people and the planet.

26.     ASBC brings this lawsuit on behalf of its members. Collectively, ASBC and its associational members represent over 200,000 businesses across the country. Two of ASBC's members—Etho Capital, LLC ("Etho Capital") and Sphere—have had their flagship investment funds placed on a blacklist by Defendants pursuant to SB 13. Other members are now ineligible to compete for contracts with covered entities under SB 13 unless they forgo their First Amendment rights.

27.    Defendant Glenn Hegar is sued in his official capacity as Texas Comptroller of Public Accounts. The Comptroller is Texas's chief financial officer—the State's treasurer, check writer, tax collector, procurement officer, and revenue estimator. The Comptroller has numerous powers and duties under the Texas Government Code chapters on State Purchasing and General Services. *See, e.g.*, Tex. Gov't Code §§ 2151.004(d), 2155.0011, 2155.0012. The Comptroller also plays a central role in SB 13's statutory scheme. Among other duties, SB 13 tasks the Comptroller with preparing and maintaining a list of financial companies that "boycott" fossil fuels. Tex. Gov't Code § 809.051(a).

28.    Defendant Ken Paxton is sued in his official capacity as Attorney General of Texas. As Texas's chief legal officer, the Attorney General is responsible for defending the State's duly elected laws. In addition, the Attorney General is empowered to enforce the Divestment Provision. Tex. Gov't Code § 809.102.

29.    In suing each of these Defendants, Plaintiff seeks to obtain only declaratory and injunctive relief, as well as costs and attorneys' fees.

## **FACTS**

**1.      The risks posed by climate change influence many companies' investment and business decisions, and spur advocacy against climate change.**

30.    Human combustion of fossil fuels (such as oil, coal, and natural gas) to produce energy generates carbon dioxide, methane, and other greenhouse gases, and the increasing concentration of these greenhouses gases in the atmosphere creates climate risk. The effects of climate change include a warming of the atmosphere and oceans, melting of polar snow and ice caps, rising sea levels, acidified oceans, disrupted hydrological systems, and increased occurrences of extreme weather events including more powerful storms, heat waves, and prolonged droughts.

31.     The United States, and the world, is already experiencing the overwhelmingly deleterious effects of climate change. Scientists and governments have agreed that maintaining global temperature rise to 1.5°C above the historical average will reduce the massive disruptions predicted with warmer global temperatures, including globally disrupted food systems, economies, and communities on an unprecedented scale. Many countries, including the United States, have begun taking measures to curb greenhouse gas emissions. However, under current policies, global warming is anticipated to exceed 2°C. For this reason, many national, state, and local governments are increasingly issuing legislation and regulations geared toward a low- or zero-carbon future.

32.     Climate change poses significant risks to the American economy, and many companies take that risk into account in operating their business, including in choosing investments, manufacturing and other process designs, and in developing product and service offerings. "Climate risk" exists in several forms: <u>physical risks</u>, such as physical impacts of climate change, impacts on infrastructure and human health, and devaluation of assets; <u>transition risks</u>, such as changes in applicable regulatory policy or consumer preferences, increased operating costs, and devalued or stranded assets or capital; and <u>financial risks</u>, such as the risks to financial markets including financial losses for banks, asset owners, financial institutions, and fund beneficiaries, as well as businesses across the economy buffeted by the global economic dislocations created by climate change. These are grave risks to financial institutions, market functioning, and the stability of the American financial system as a whole.

33.     Mindful of the economic risks posed by climate change, many investment firms and banks (collectively "financial companies") understand that companies that integrate climate risk and sustainability considerations into their strategic decisions, business processes, product and service offerings, and risk management frameworks are more likely to preserve their credit quality than

companies that do not. Recognizing this, many financial companies have already incorporated or have begun incorporating climate risk considerations into relevant analyses and decision-making.

34.    Many financial companies also appropriately consider the likelihood that climate-related regulations will increase in the future, disproportionately affecting companies that are failing to transition toward a low carbon economy. As the principal contributors to greenhouse gas emissions, companies in the fossil fuel industry will likely experience significant decreases in value, or even become obsolete, as societies implement the necessary transition from reliance on fossil fuel energy to more sustainable energy sources, such as wind and solar energy. Many financial analysts expect companies that have already begun implementing strategies to mitigate and adapt to climate change to fare better in the long term than those that have not. Texas is home to countless clean energy projects, and Texas-based companies lead the country in green energy and green economy innovation.

35.    Many companies have joined initiatives like Climate Action 100+ and "Net Zero" alliances. The Net Zero Asset Managers Initiative, for example, "is an international group of asset managers committed, consistent with their fiduciary duty to their clients and beneficiaries, to supporting the goal of net zero greenhouse gas emissions by 2050 or sooner, in line with global efforts to limit warming to 1.5 degrees Celsius; and to supporting investing aligned with net zero emissions by 2050 or sooner." The initiative requires member asset managers to publish their progress annually.

36.    Companies regularly advocate for action on climate change and climate risk. They seek to limit the disastrous effects of climate change, and they believe that an effective way to do so is to refrain from further investment in the industry that has contributed most to climate change: fossil fuels. Many companies also speak about their views on the sustainability or ethics of fossil fuel

companies as part of their appeals to potential clients or for policy changes. Even major *fossil fuel producing companies* promote their plans to transition away from unrestricted fossil fuel production.

### 2. Texas's unconstitutional law punishes expression regarding fossil fuels.

37.     The Texas legislature enacted SB 13 to target what it perceived as a "burgeoning fossil fuel discrimination movement" that aims to reduce reliance on fossil fuels.[8] The law violates the First Amendment by barring companies from competing for state investments or contracting with the state whenever Texas believes those companies espouse a disfavored viewpoint about fossil fuels. To reach this end, SB 13 prohibits constitutionally protected expression and compels politicized speech. The prohibition is compounded by a lack of due process in ascertaining what conduct is prohibited and in challenging blacklisting decisions.

### a) SB 13's Divestment Provision, Tex. Gov't Code §§ 809.001 et seq.

38.     SB 13 prohibits certain state entities from investing in, and requires them to divest from, financial companies that "boycott energy companies." This provision effectively muzzles companies that wish to express criticism of unchecked fossil fuel consumption or take affirmative steps to reduce carbon emissions.

39.     "Boycott energy company" is broadly defined to mean:

>   without an ordinary business purpose, refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company because the company:

>   (A)     engages in the exploration, production, utilization, transportation, sale, or manufacturing of fossil fuel-based energy and does not commit or pledge to meet environmental standards beyond applicable federal and state law; or

---

[8] Texas Senate Research Center, S.B. 13 Bill Analysis (June 7, 2021), available at https://legiscan.com/TX/supplement/SB13/id/205620.

(B)      does business with a company described by Paragraph (A).

Tex. Gov't Code § 809.001(1).

40.      SB 13 puts no limits on what constitutes "taking any action" that will be understood as "intended to penalize" a company in the fossil fuel industry or a company that "does business with a company" in the fossil fuel industry. An "action . . . intended to penalize" the fossil fuel industry on its face reaches speech, including expression advocating against societal reliance on fossil fuels, advocating against investment in fossil fuel companies, and publicizing decisions to not invest in fossil fuel companies.

41.      Indeed, as described *infra*, SB 13 has been interpreted to reach—and has been applied by the Comptroller and the Attorney General—companies based on their speech and associations.

42.      Nor does SB 13 provide guidance on what it means to "limit commercial relations with" a fossil fuel company or a company that does business with a fossil fuel company. For example, it is unclear what actions constitute "commercial relations" and whether "limit[ing]" those actions means only ceasing ongoing business with fossil fuel companies or also refraining from starting new business with fossil fuel companies, reducing the amount of business, or other decisions.

43.      SB 13 requires the Comptroller to make a list of all financial companies that "boycott energy companies" (the "blacklist"). *Id.* § 809.051(a). To determine whether a financial company boycotts energy companies, the Comptroller may research and rely upon information from "non-profits" and "research firms." *Id.* The Comptroller may ask the company to verify in writing that it does not boycott energy companies. *Id.* A financial company that fails to provide written verification that it does not "boycott energy companies" within 60 days of receiving such a request from the Comptroller is presumed to boycott energy companies. *Id.* § 809.051(b).

44.      The Comptroller must update the blacklist between one and four times a year. *Id.* § 809.051(c). The Comptroller must give the blacklist to each house of the legislature and the

attorney general, and post it online, all within 30 days of its being prepared or updated. *Id.*
§ 809.051(d). The Comptroller must also provide the list to covered state investment funds, *id.*
§ 809.051(a), referred to as "state governmental entities" in the statute.[9]

45.     Within 30 days of receiving the Comptroller's list, the state governmental entities must
identify for the Comptroller any listed financial companies in which the entity "owns direct or
indirect holdings." Tex. Gov't Code § 809.052; *see also id.* §§ 809.001(3), (5) (definitions of
"direct holdings" and "indirect holdings").

46.     The state governmental entity must send a written notice to each blacklisted financial
company in which a state governmental entity owns holdings:

> (1) informing the financial company of its status as a listed financial company;
>
> (2) warning the financial company that it may become subject to divestment by state
> governmental entities after the expiration of the period described by Subsection (b); and
>
> (3) offering the financial company the opportunity to clarify its activities related to
> companies described by Sections 809.001(1)(A) and (B).

*Id.* § 809.053(a). The state governmental entity is not required to explain the basis for the
company's blacklisting and may, in fact, not even have such information.

47.     The financial company has 90 days after receiving the written notice to "cease boycotting
energy companies" in order to be removed from the blacklist. *Id.* § 809.053(b), (c). SB 13 provides
no guidance as to how a financial company could remove itself from the blacklist if the
Comptroller included it on the blacklist for "terminat[ing] business activities" or taking other

---

[9] SB 13 applies to the following "state governmental entit[ies]": (A) the Employees Retirement System of Texas,
including a retirement system administered by that system; (B) the Teacher Retirement System of Texas; (C) the Texas
Municipal Retirement System; (D) the Texas County and District Retirement System; (E) the Texas Emergency
Services Retirement System; and (F) the permanent school fund. *Id.* § 809.001(7).

14

"action that is intended to . . . limit commercial relations" with a fossil fuel company—whether, for example, the financial company must resume the terminated business activities or expand commercial relations.

48.     If the financial company does not "cease boycotting energy companies," then "the state governmental entity shall sell, redeem, divest, or withdraw all publicly traded securities of the financial company," *id.* § 809.053(d), except for indirect holdings in actively or passively managed investment funds, *id.* § 809.055(a).

49.     The Divestment Provision sets forth no procedure by which a financial company may obtain the evidence supporting its blacklisting, rebut or comment on such evidence, or otherwise appeal the Comptroller's decision to include the financial company or its fund on the blacklist.

50.     After a financial company is notified that it has been placed on the blacklist, state governmental entities must divest at least 50 percent of their managed assets from the financial company within 180 days and must divest 100 percent within 360 days. *Id.* § 809.054. The statute also prohibits state entities from making new investments in a listed financial company. *Id.* § 809.057.

### b)  SB 13's Procurement Provision, Tex. Gov't Code §§ 2276.001 et seq.

51.     SB 13 also contains a provision addressing the state's procurement of contracts. The Procurement Provision has many of the same constitutional infirmities as the Divestment Provision. It too is content- and viewpoint-discriminatory, overbroad, and vague.

52.      The Procurement Provision states that "a governmental entity may not enter into a contract with a company for goods or services unless the contract contains a written verification from the company that it: (1) does not boycott energy companies; and (2) will not boycott energy companies during the term of the contract." Tex. Gov't Code § 2276.002(b). The prohibition applies to

contracts valued at $100,000 or more that are to be paid wholly or partly from public funds, entered into with companies with at least 10 full-time employees. *Id.* § 2276.002(a).

53.     "Boycott energy company" has the same broad and vague definition as under the Divestment Provision. *See id.* § 2276.001. Like the Divestment Provision, the Procurement Provision is both unconstitutionally overbroad and unconstitutionally vague because it (1) encompasses speech and (2) does not adequately define "action that is intended to penalize, inflict economic harm on, or limit commercial relations with a company because the company" is in the fossil fuel industry or does business with a company in the fossil fuel industry.

54.     Since a "governmental entity" means "a state agency or political subdivision of" Texas, *id.* § 2251.001(3); *see id.* § 2276.001, this procurement prohibition applies to all levels of state government, including state agencies, counties, municipalities, and school districts.

### c)   SB 13's "No Private Cause of Action" Provision, Tex. Gov't Code § 809.004

55.      SB 13 also includes a provision stating that a party "may not sue or pursue a private cause of action . . . for any claim or cause of action . . . in connection with this chapter." Tex. Gov't Code § 809.004(a).

56.     SB 13 backs up this bar to judicial review with a fee-shifting provision that requires a party who files suit "to pay the costs and attorneys' fees of a person sued in violation of this section." *Id*. § 809.004(b).

57.     This provision chills exercise of the First Amendment right of access to the courts in two ways. First, it outright bars legal actions connected to the statute, even if causes of action exist under other state law. Second, it penalizes even successful litigants by forcing the suing party to pay the government's defense fees and costs.

3.     <u>**SB13 has allowed the Comptroller to punish speech he dislikes.**</u>

58.     SB 13's viewpoint discrimination and unconstitutional vagueness empower Texas officials to punish companies they believe are insufficiently supportive of the fossil fuel industry.

59.     They have done exactly that. The Comptroller has sought to coerce financial companies to chill their expression if they want to compete for investments from state entities, as well as for contracts with the state. He has used the vague terms of SB 13's Divestment Provision to arbitrarily decide whether a particular financial company "boycott[s]" fossil fuels, and if so, whether the company does so pursuant to an "ordinary business purpose."

60.     The Comptroller sent questionnaires to numerous financial companies in and around March 2022 and again in and around summer 2023. The questions included whether the company is publicly traded; whether the company has committed to meet environmental standards beyond applicable law; whether the company has a policy restricting investment in energy companies; whether the company offers any funds that have a policy restricting investment in energy companies; and whether the company "boycott[s] energy companies" under the definition in the Divestment Provision.

61.     Many companies explained in their responses to these questionnaires that they did not "boycott" energy companies even if they were members of certain associations or managed some funds that do not invest in fossil fuels for ordinary business purposes.

62.     In response to the questionnaires, many companies stated that they consider climate-associated risk in at least some cases when making investment decisions. These companies explained that they take climate considerations into account because it is a good investment strategy to do so. For example:

- International asset manager State Street Global Advisors stated: "As a fiduciary and long-term investor, SSGA believes that climate risk can be relevant to a company's long term financial performance."

- BNP Paribas stated: "BNP Paribas manages its overall financial risk by analyzing closely all sources of risks in its portfolio, including environmental, social, and governance risks, which may have reputational, legal, financial and financing access consequences on its clients. As a result, Group has been integrating climate-related and environmental factors in its overall risk strategy to manage its credit, market, and operational risks. This framework ensures that analysis and due diligence is performed on corporate clients to understand their associated environmental and climate-related risks."

- One boutique wealth management firm with over $5 billion in assets under management stated that a fund under its management excludes fossil fuels based in part on "our estimation of imbedded asystematic risk inherent in the sector and the resulting outperformance achieved by the avoidance of said risk."

These companies or their funds, and several others who made similar statements, were subsequently blacklisted.

63. Even the Comptroller has acknowledged that "[t]he concepts associated with ESG have been around for a while, and some of the information contemplated by ESG can be helpful as investors decide where and how to invest their money." Yet the Comptroller blacklisted companies that explained they consider ESG factors for risk evaluation purposes.

64. Many companies explained that they take climate considerations into account when making investment decisions at the request of clients or to satisfy market demand. For example:

- One Massachusetts-based investment management firm with institutional and private clients stated that it "offers investment vehicles that are responsive to a wide range of clients, including clients seeking portfolios managed with lower carbon risk, whether with or without exposure to companies in the energy sector."

- A Maryland-based investment management firm with clients in nearly 50 countries stated: "Once a client determines it would like to pledge its assets in support of the [Net Zero Asset Managers Initiative], [we] will be committed to meeting the client's net zero targets, while continuing to uphold our fiduciary duties to these clients and strategies."

- One investment products and advisory services firm stated: "[We] offer[] [ESG] funds, along with many other funds that *do support* the exploration, production, utilization, transportation, sale or manufacturing of fossil-fuel based energy, with an ordinary business purpose of following clients' investment objectives and policies that the market demands while complying with [our] fiduciary duties."

These companies and others similarly situated (or their funds) were subsequently blacklisted.

65.    Some companies explained that they take climate considerations into account pursuant to applicable law. For example,

- BNY Mellon, which manages nearly $50 trillion in assets and works with 90% of Fortune 100 companies, explained that it "risks being in breach of its regulatory and fiduciary obligations if it . . . fails to meet regulatory requirements to consider environmental factors in its investments . . . ."

- HSBC indicated that, as a UK financial institution, it may be required to comply with certain disclosures or decarbonization requirements consistent with the goal of obtaining carbon neutrality by 2050 imposed by the UK government. "HSBC faces additional risks

if it is perceived to mislead stakeholders in respect of its climate strategy, the climate impact of a product or service, or the commitments of our customers. This could result in legal action and/or regulatory investigations being brought against HSBC with associated financial consequences."

- Danske Bank stated that it takes certain actions "to support among other[s] the overall ambition of achieving climate neutrality stipulated in the EU Climate Law delivering on the implementation of the Paris Agreement adopted under the United Nations Framework Convention on Climate Change."

Yet these companies were subsequently blacklisted.

66.     Several companies explained that they take climate considerations into account as part of evaluating future regulatory risk to investments. For example:

- One asset management company headquartered in Chicago with over $1 trillion of assets under management stated: "We expect that governments will likely continue to mandate regulatory changes to reduce carbon emissions. This represents a potential threat to profits of companies with higher emissions than peers."

- An asset management firm headquartered in London with nearly $50 billion in assets under management stated: "For all of our strategies, we aim to build more resilient portfolios for our investors by managing risks, including climate-related risks. Specifically, we believe climate change poses material risks to fossil fuel companies in the form of expected government intervention to regulate greenhouse gases, changes in consumption patterns, and other liabilities, like stranded asset risk, reputational risk, and litigation risk."

- A boutique asset management company stated that one of the funds it manages excludes fossil fuels in part because "[t]he Energy sector is/has been extremely volatile and per our analysis, represents significant regulatory risk exposure on a go forward basis."

Yet these companies or their funds were subsequently blacklisted.

67.    Several companies explicitly invoked the "ordinary business purpose" component of the statutory definition of "boycott energy company" in explaining why they do not "boycott" fossil fuels as the term is defined by SB 13. For example:

- One U.S.-based investment management company with over $5 billion in assets under management stated: "The ordinary business purpose of [our company] is to (i) manage client assets integrating environmental, social, and governance factors into the financial analysis to help identify the best companies positioned to deliver long-term risk adjusted performance . . . ."

- BlackRock, Inc. stated: "Even in circumstances where BlackRock decides not to make an investment in a particular company, it is clearly driven by an 'ordinary business purpose'; that is, to prudently and in accordance with our fiduciary duty manage investments for our clients, including for Texas clients. In furtherance of that purpose, BlackRock seeks to maximize returns and minimize risk in accordance with our clients' investment objectives."

- A global investment company with over $450 billion in assets under management stated: "We deem our obligation to comply with our fiduciary duties as an 'ordinary business purpose' which is permitted under the Code."

These companies and many others (or their funds) were subsequently blacklisted.

68.    In responses to the questionnaire, numerous companies indicated that they had joined the Net Zero Asset Managers Initiative or similar initiatives. These include BNP Paribas, Danske Bank, BlackRock, Inc., and HSBC Holdings, all of which were subsequently blacklisted.

69.    The Comptroller posted the first edition of the blacklist to the Comptroller's website on August 24, 2022. The August 2022 blacklist is an Excel spreadsheet with two tabs labeled Annex I and Annex II. Annex I contains a list of ten publicly traded financial companies, and Annex II contains a list of 348 funds, or groups of funds, managed by scores of publicly traded and non-publicly traded companies. Annex II includes funds created by ASBC members.

70.    The Comptroller issued a FAQ sheet simultaneously with the blacklist. Regarding the preparation of Annex II, the FAQ sheet states that the Comptroller "relied upon a [fund] manager's response" to the Comptroller's questionnaire "when reasonable," but does not explain when the Comptroller considered it unreasonable to do so. The Comptroller did not explain how he assessed whether responses including information about climate-related risks qualified as an "ordinary business purpose."

71.    Consistent with the Comptroller's statements regarding targeting "anti-oil and gas rhetoric," the FAQ sheet further states: "However, the Comptroller considered and reconciled prima facie inconsistencies between a manager's response and publicly available information."

72.    The August 2022 FAQ sheet suggests that companies on the blacklist are also prohibited from contracting with governmental entities under the Procurement Provision. Answering a question about whether state and local governments can contract with an entity affiliated with a company on the blacklist, it states that a governmental entity "may not enter into a contract of more than $100,000 with a company with 10 or more employees for goods and services unless the contract contains written verification that the company does not boycott energy companies and

will not do so during the term of the contract." On information and belief, such written verification requirements are included routinely in state and local government contracts, irrespective of the size of the contract or the number of contractor employees.

73.    On August 24, 2022, the Comptroller published a statement on the Comptroller's website regarding the blacklist. The Comptroller stated: "This research [on the boycott of energy companies] uncovered a systemic lack of transparency that should concern every American regardless of political persuasion, especially the use of doublespeak by some financial institutions as they engage in anti-oil and gas rhetoric publicly yet present a much different story behind closed doors." This statement indicates that the Comptroller used SB 13 to target companies that "engage in anti-oil and gas rhetoric," even where the companies' investment practices do not fall within the law's definition of "boycott" fossil fuels.

74.    Similarly, in an October 2022 press interview, the Comptroller confirmed that "some companies that would not be on our list *that are not boycotting oil and gas*" were nonetheless blacklisted because of their public statements about oil and gas.[10]

75.    The Comptroller issued an updated FAQ sheet in November 2022 which provided the following explanation of SB 13 and its implementation: "[Q.] What steps can a financial company take to be removed from Annex I? . . . [A.] "[A]n entity that is no longer included on the Climate Action 100 and Net Zero Banking Alliance/Net Zero Asset Managers Initiative . . . would no longer meet the initial criteria for listing." Thus, the Comptroller has instructed blacklisted companies that withdrawing from associations that aim to address climate change risk is key to avoiding the blacklist, even if they make no changes to their actual investment policies or practices.

---

[10] Liz Crampton, *The state comptroller needling BlackRock*, Politico (Oct. 12, 2022), https://web.archive.org/web/20221110194819/https://www.politico.com/newsletters/the-long-game/2022/10/12/the-state-comptroller-needling-blackrock-00061392 (emphasis added).

76.    The November 2022 FAQ also states that the Comptroller considered a financial company's commitment to support net zero emissions by any year earlier than 2050 as evidence that the company "boycott[s]" fossil fuels without an ordinary business purpose.

77.    The Comptroller posted an updated blacklist and FAQ sheet in March 2023.

78.    The March 2023 blacklist adds a financial company to Annex I and includes almost all of the same funds and groups of funds in Annex II as the August 2022 blacklist. Funds created by ASBC members were listed on Annex II of the March 2023 blacklist.

79.    The March 2023 FAQ sheet states: "[A] fund which is limited by law or regulation from investing in the oil and gas industry, but nonetheless includes ESG or other considerations concerning oil and gas in its investment assessments or decisions, may still be subject to listing." This statement underscores that the Comptroller will blacklist companies that engage in anti-fossil fuel speech, even when their lack of fossil fuel investment is compelled by the ordinary business purpose of complying with applicable law. This vague application of the law highlights the vagueness of SB 13's "ordinary business purpose" exception. Indeed, as discussed above, several companies that represented that they take climate considerations into account pursuant to applicable law were nonetheless blacklisted.

80.    The March 2023 FAQ also underscores the inherent overbreadth and vagueness of SB 13's definition of "boycott" and the Comptroller's application thereof. The FAQ states that "[a] financial company may have investments in the Texas oil and gas industry and still be 'boycotting' under the law." This statement makes clear that the Comptroller is targeting companies for their viewpoint, speech, and protected expression, and that a company cannot identify with any certainty whether its actions or expression will trigger blacklisting. Indeed, as discussed above, companies

that represented that they are heavily invested in Texas energy companies—including fossil fuel companies—were nonetheless blacklisted.

81.     The Comptroller posted an updated blacklist on November 1, 2023. Funds created by ASBC members are listed on Annex II of the November 2023 blacklist.

82.     Although the Comptroller did not explain why he included certain companies and funds, and why he excluded other companies and funds, from the blacklist, a reason—punishing companies that engage in anti-fossil fuel rhetoric—can be gleaned from reviewing companies' statements alongside their blacklisted status.

83.     For example, in May 2022, Kayne Anderson Capital Advisors, L.P. stated to the Comptroller that the Kayne Anderson Renewable Infrastructure Fund has an investment objective "to invest at least 80% of its net assets in a portfolio of renewable infrastructure companies that are involved in business activities related to renewable energy production, storage and transmission." The Comptroller included this fund on the August 2022 and March 2023 blacklists.

84.     In August 2023, Kayne Anderson made the case to the Comptroller to remove the Renewable Infrastructure fund from the blacklist. Kayne Anderson explained that, rather than excluding fossil fuel companies, the Renewable Infrastructure Fund is required by applicable law to invest at least 80% of its assets in what it was named after: renewable energy infrastructure. The Renewable Infrastructure Fund was not included in the November 2023 blacklist.

85.     Yet BlackRock appears on all three iterations of the blacklist, even though it told the Comptroller that it holds $115 billion of investments in Texas-based energy companies. The difference, as far as Texas is concerned, is that BlackRock has publicly spoken out against the fossil fuel industry. An article published on the Comptroller's website cited BlackRock's "'net-

zero' public pledges" and "adversarial rhetoric regarding the fossil fuels sector" as reasons for remaining on the blacklist.[11]

86.    The Etho Fund—a fund created by an ASBC member—is blacklisted even though it invests in Texas Instruments, a Dallas, Texas-based company that manufactures semiconductors, including those used in clean energy infrastructure.

87.    The Comptroller issued a press release at the time that the November 2023 blacklist was posted.[12] The Comptroller stated that his "goal has always been to bring some honesty to what has really been a one-sided and intellectually dishonest discussion," and "to end the doublespeak by so many companies and show the critical impact that fossil fuels have on our daily lives. Fostering transparent conversation in Texas and throughout our nation ultimately creates a change in behavior by financial institutions."[13]

88.    The Comptroller issued a FAQ at the time that the November 2023 blacklist was posted.[14] The November 2023 FAQ continues to state that "[a] financial company may have investments in the Texas oil and gas industry and still be 'boycotting' under the law."[15]

89.    In the November 2023 FAQ, the Comptroller described a process by which he decided whether to place a company on Annex I or a fund on Annex II through consideration of: the companies' relevant governance and policies; [16] publicly available information about the

---

[11] https://comptroller.texas.gov/economy/fiscal-notes/archive/2023/may/fossil-fuels/.

[12] Texas Comptroller, Texas Comptroller Glenn Hegar Announces Update to List of Financial Companies that Boycott Energy Companies (Nov. 1, 2023), https://comptroller.texas.gov/about/media-center/news/20231101-texas-comptroller-glenn-hegar-announces-update-to-list-of-financial-companies-that-boycott-energy-companies-1698777763111.

[13] *Id.*

[14] November 2023 FAQ Sheet, https://comptroller.texas.gov/purchasing/docs/divest-energy.pdf.

[15] *Id. at 1.*

[16] *Id. at 3.*

companies and funds, including a fund's prospectus and holdings; [17] "public pledges and commitments," including whether to achieve a net zero approach to carbon emissions prior to 2050;[18] the companies' "adherence to the public principles" of Climate Action 100, Net Zero Banking Alliance, and Net Zero Asset Managers Initiative;[19] and whether a financial company has a "proxy voting record that demonstrated antagonism toward fossil fuel-based energy industry."[20]

90.   In the November 2023 FAQ, the Comptroller stated that a company that wished to be removed from Annex I "should change its practices so that it does not refuse to deal with, terminate business activities with, or otherwise take actions intended to penalize, inflict economic harm on, or limit commercial relations with energy companies because they are energy companies."[21]

91.   The Comptroller's statements about the blacklist have confirmed that SB 13, both on its face and its application, targets protected speech and association.

92.   The Comptroller's practice of enforcing SB 13 confirms the statute's unconstitutionality.

    a.   The Comptroller has used his authority under SB 13, Tex. Gov't Code § 809.051, to consider publicly available information about a company, including the company's speech and protected expression, to determine whether to place the company on the blacklist.

    b.   These statements demonstrate that the Comptroller expects companies to adopt the state of Texas's and Defendants' preferred viewpoints and speech in favor of fossil fuels.

    c.   Further, the Comptroller's statements about the blacklist have confirmed that SB 13 permits the Comptroller to apply the statute without clear standards and in an arbitrary

---

[17] *Id. at 3, 7.*

[18] *Id. at 2-4.*

[19] *Id. at 4.*

[20] *Id. at 5.*

[21] *Id. at 6.*

manner, without sufficient notice to companies as to what conduct, speech, protected expression, or activity is covered by the statute and/or will result in their placement on the blacklist.

d. In particular, the Comptroller targets speech and protected expression when he automatically blacklists companies (or funds) based on a company's commitment to "align[] lending and investment portfolios with 'net zero' prior to 2050."[22]

93.     The Attorney General has also asked state agencies to identify and cut ties with companies based on their membership in associations that take political or social stances. In the fall of 2023, General Paxton released an advisory regarding SB 13. He stated that the list of entities on the blacklist is not an exhaustive list of companies that are in violation of state law. The Attorney General stated that state agencies and political subdivisions should "do more than simply rely upon written verifications when contracting with companies," including reviewing "readily and publicly available information that a company is a boycotter." Governmental entities should consider "red flags" such as a company's membership in the Net Zero Banking Alliance or being a "signatory of any other similar entity that espouses a commitment to the furtherance of so-called Environmental, Social and Governance policies."[23]

### 4.     ASBC's members have been injured and will continue to suffer injury as a result of SB 13

94.     As noted above, two of ASBC's members, Etho Capital and Sphere, are investment companies whose funds were placed on the blacklist by Defendants.

95.     Etho Capital believes that investing in companies that manage their long-term Environmental, Social, and Governance ("ESG") risks is preferable to investing in companies that

---

[22] Comptroller of Public Accounts, List of Financial Companies that Boycott Energy Companies, Frequently Asked Questions (Updated October 2023), at 4.

[23] Attorney General of Texas, *supra* note 5, at 5.

do not, because ESG-conscious companies tend to have better management and have been able to outperform their less sustainable counterparts over longer time periods. Etho Capital believes it can achieve superior financial performance through sustainability and positive social impact.

96.     Etho Capital created the Etho Climate Leadership Index US—an index of American companies that are industry leaders in climate and ESG standards. The Etho Climate Leadership U.S. exchange-traded fund (the "Etho Fund") is composed of investments in companies in the Etho Climate Leadership Index US. This Etho Fund was launched in 2015 as the first broadly diversified, fossil fuel-free, and ESG-screened U.S. exchange-traded fund on the New York Stock Exchange.

97.     Etho Capital advocates against reliance on fossil fuels or investment in fossil fuel companies, both to limit the disastrous effects of climate change and to avoid the financial and market risks posed by the massive changes in the oil and gas industry expected as a result of unusable and unburnable fossil fuel assets due to climate change policies and improved electrification and renewable energy technologies.

98.     For all of these reasons, Etho Capital does not include fossil fuel companies in the Etho Climate Leadership US Index or the Etho Fund.

99.     Our Sphere, Inc. ("Sphere"), another member of ASBC, was created to provide climate-friendly investment options to retirement plans by a team that is passionate about climate change and experienced with growing and protecting investments.

100.    Sphere created the Sphere 500 Climate Fund (formerly the Sphere 500 Fossil Free Fund) (the "Sphere Fund"), a U.S. large cap equity investment option that refrains from investing in the fossil fuel industry. The Sphere Fund invests in companies in the Sphere 500 Fossil Free Index, which tracks the top 500 U.S. companies by market capitalization except for companies that

Sphere eliminates from the Index based primarily on the risks they face as a result of exposure to the fossil fuel industry. Sphere also removes companies based on other exclusionary screens, including companies engaged in deforestation activities, civilian and military firearms manufacturing and related guns/arms sales, prison and border security operations, and tobacco and e-cigarette manufacturing.

101.     Sphere designed the Sphere Fund to not invest in fossil fuels to satisfy market demand and to practice sound investment strategy. According to S&P Global, the fossil fuel sector significantly underperformed other sectors of the economy from 2010-2019.[24] The International Energy Agency has predicted that fossil fuel consumption will "peak before 2030" and then decline as the clean energy transition "usher[s] in the beginning of the end of the fossil fuel era."[25]

102.     ASBC members, including Etho Capital and Sphere, are members of associations that advocate for sustainable investment decisions that are cognizant of the effects of climate change on human life and the planet.

103.     SB 13 harms ASBC's members in several ways.

104.     *First*, SB 13 discriminates against ASBC members like Etho Capital and Sphere on the basis of the content and viewpoint of their speech, forcing them to choose between their First Amendment rights and their ability to compete for investments from and contracts with covered entities.

105.     ASBC members wish to continue to make investment decisions and create investment products based on their investment philosophies—to maximize investment returns by managing

---

[24] Matt Moran, S&P Global, Performance and Volatility for Sectors in the 2010s (Jan. 25, 2020), https://www.spglobal.com/en/research-insights/market-insights/performance-and-volatility-for-sectors-in-the-2010s (noting that the energy sector in the S&P 500— which is composed solely of fossil fuel companies—grew only 40% in the 2010s compared to other sectors that grew 340%.

[25] International Energy Agency, *World Energy Outlook 2023 Executive Summary* (last visited July 11, 2023), https://www.iea.org/reports/world-energy-outlook-2023/executive-summary.

climate risk, while advancing the goal of mitigating climate change. ASBC members also wish to continue to make statements expressing their views concerning fossil fuels, climate change, and climate risk. However, because of SB 13, these members must either abandon their rights or forgo the ability to compete for investments from covered entities.

106.    Likewise, other ASBC members must choose between those same rights and the ability to compete for contracts with covered entities. Such actions are protected speech and yet likely constitute a prohibited "boycott" under SB 13.

107.    *Second*, SB 13 harms ASBC members by restricting their freedom of association. For example, SB 13 harms Etho and Sphere by making their membership in associations that advocate for sustainable and climate conscious investing potentially a form of "boycott[ing] energy companies," resulting in state entities being unable to invest or contract with these ASBC members.

108.    *Third*, SB 13 compels ASBC members to adopt the view held by the state of Texas regarding fossil fuels, and alter their speech, policies, and expressive conduct, in order to receive contracts with state entities.

109.    *Fourth*, SB 13 harms ASBC's members because the vague and overbroad terms of SB 13 leave ASBC's members unable to determine which actions or expression will constitute a "boycott" of fossil fuels. As a result, ASBC's members do not have enough information to determine how to modify their actions or expression to come into compliance with the law.

110.    Likewise, other ASBC members may be unable to submit the written verification required by SB 13 that they do not or would not boycott energy companies because they are unsure whether their actions constitute a "boycott" within the meaning of the statute.

111.    *Fifth*, ASBC's members have been denied due process. While SB 13 permits an exception to being blacklisted where a company acts with an "ordinary business purpose," no meaningful process or guidance currently exists for the Comptroller's application of this exception or for ASBC's members to contest their funds' placement on the blacklist under this exception. SB 13 provides no procedure to appeal the Comptroller's decision to include a fund or financial company on the blacklist.

## CLAIMS FOR RELIEF

### Count One
### Infringement of Freedom of Speech and Freedom of Association
### First Amendment, 42 U.S.C. § 1983
### Divestment Provision

112.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

113.    By prohibiting state entities from investing in financial companies based on, among other things, speech and other expressive conduct advocating against reliance on fossil fuels, the Divestment Provision is a content- and viewpoint-based restriction that infringes upon constitutionally protected speech.

114.    Because SB 13 codifies viewpoint-based discrimination, it is presumptively unconstitutional.

115.    The Divestment Provision fails strict scrutiny because it is not narrowly tailored to advance a compelling government interest.

116.    Even if the Divestment Provision were subject to rational basis review, it would be unconstitutional. The state has no legitimate interest in prohibiting state entities from investing with financial companies that the state perceives to engage in anti-fossil fuel speech or expression.

117.    The Divestment Provision also violates financial companies' freedom of association. It punishes financial companies merely for belonging to an association, such as the Net Zero Asset Managers Initiative or other group or association that advocates for sustainable investing or other sustainable practices. It also punishes financial companies for refusing to associate with companies in the fossil fuel industry or with companies that refuse to associate with companies in the fossil fuel industry. It also harms ASBC and its members by punishing companies that choose to join associations that advocate for sustainable initiatives to address climate change.

118.    The Divestment Provision also compels financial companies to adopt the view of the state of Texas regarding fossil fuel, and to alter their speech, policies, and expressive conduct in order to contract with state entities.

119.    The Divestment Provision therefore violates the First Amendment.

**Count Two**
**Violation of Due Process**
**Fourteenth Amendment, 42 U.S.C. § 1983**
**Divestment Provision**

120.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

121.    By failing to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, the Divestment Provision fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

122.    The vagueness of the Divestment Provision also authorizes and encourages arbitrary and discriminatory application to financial companies.

123.    The Divestment Provision is therefore unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause.

**Count Three**
**Infringement of Freedom of Speech and Association**
**First Amendment, 42 U.S.C. § 1983**
**Procurement Provision**

124.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

125.    By prohibiting governmental entities from contracting with companies based on, among other things, speech and expressive conduct advocating against reliance on fossil fuels, the Procurement Provision is a content- and viewpoint-based restriction that infringes upon constitutionally protected speech.

126.    Because the Procurement Provision codifies viewpoint-based discrimination, it is presumptively unconstitutional.

127.    The Procurement Provision also fails strict scrutiny because it is not narrowly tailored to advance a compelling government interest.

128.    Even if the Procurement Provision were subject to rational basis review, it would be unconstitutional. The state has no legitimate interest in prohibiting governmental entities from contracting with companies that the state perceives to engage in anti-fossil fuel speech or expression.

129.    The Procurement Provision also violates companies' freedom of association. It punishes companies merely for belonging to an association, such as the Net Zero Asset Managers Initiative or other group or association that advocates for sustainable investing or other sustainable practices. It also punishes companies for refusing to associate with companies in the fossil fuel industry or with companies that refuse to associate with companies in the fossil fuel industry. It also harms ASBC and its members by punishing companies that choose to join associations that advocate for sustainable initiatives to address climate change.

130.    The Procurement Provision also compels companies to adopt the view of the state of Texas regarding fossil fuel, and to alter their speech, policies, and expressive conduct in order to contract with state entities.

131.    The Procurement Provision therefore violates the First Amendment.

**Count Four**
**Violation of Due Process**
**Fourteenth Amendment, 42 U.S.C. § 1983**
**Procurement Provision**

132.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

133.    By failing to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, the Procurement Provision fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

134.    The vagueness of the Procurement Provision also authorizes and encourages arbitrary and discriminatory application to companies.

135.    The Procurement Provision is therefore unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause.

**Count Five**
**Infringement on Right to Access the Courts**
**First Amendment, 42 U.S.C. § 1983**

136.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

137.    The First Amendment protects the right to bring suit in state and federal courts and to access the courts unimpeded by financial barriers.

138.    SB 13's "No Private Cause of Action" provision (Tex. Gov't Code § 809.004(a)) prohibits Plaintiff, and indeed any other party, from filing a lawsuit challenging any implementation or consequences of SB 13.

139.    Further, SB 13 (Tex. Gov't Code § 809.004(b)) requires any party that files a suit challenging any implementation or consequences of SB 13 to pay the attorneys' fees and costs of the opposing party, regardless of which party prevails.

140.    By barring Plaintiff from bringing a lawsuit to challenge any implementation or consequence of the law,  SB 13 (Texas Gov't Code §§ 809.004(a)) chills Plaintiff's right of access to the courts in violation of the First Amendment.

141.    By requiring the litigant to bear the attorneys' fees and costs of the opposing party regardless of outcome, SB 13 (Texas Gov't Code § 809.004(b)) chills persons from exercising their right to access the courts by imposing a monetary penalty for bringing suit, in violation of the First Amendment.

142.    Tex. Gov't Code § 809.004(a) is therefore unconstitutional as an impermissible barrier to ASBC's members from challenging the implementation or consequences of SB 13.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.  Declare that SB 13's Divestment Provision, Tex. Gov't Code §§ 809.001–809.102, is unconstitutional;

2.  Declare that SB 13's Procurement Provision, Tex. Gov't Code §§ 2276.001–2276.002, is unconstitutional;

3.  Declare that SB 13's No Private Cause of Action and fee-shifting provisions, Tex. Gov't Code § 809.004, are unconstitutional;

4. Permanently enjoin Defendants and all those in active concert and participation with them from implementing the Divestment and Procurement Provisions, and from otherwise taking adverse action with respect to any company or fund pursuant to either provision;

5. Award Plaintiff its costs, attorneys' fees, and other disbursements for this action under 42 U.S.C. § 1983; and

6. Grant any other relief this Court deems appropriate.


Dated: August 29, 2024                               Respectfully submitted,

                                                     */s/ Ketan U. Kharod*
                                                     Mary Whittle
                                                     Texas Bar No. 24033336
                                                     Mark Guerrero
                                                     Texas Bar No. 24032377
                                                     Ketan U. Kharod
                                                     Texas Bar No. 24027105
                                                     Guerrero & Whittle PLLC
                                                     510 Baylor Street
                                                     Austin, TX 78703
                                                     (512) 610-2300 phone
                                                     (512) 222-5280 fax
                                                     mary@gwjustice.com
                                                     mark@gwjustice.com
                                                     ketan@gwjustice.com

                                                     Rachel L. Fried*
                                                     DC Bar No. 1029538
                                                     Ananda V. Burra*
                                                     DC Bar No. 888314469
                                                     Kristen Miller*
                                                     DC Bar No. 229627
                                                     Victoria Nugent*
                                                     DC Bar No. 470800
                                                     Skye Perryman*
                                                     Texas Bar No. 24060411
                                                     Democracy Forward Foundation
                                                     P.O. Box 34553
                                                     Washington, D.C. 20043
                                                     (202) 448-9090

rfried@democracyforward.org
aburra@democracyforward.org
kmiller@democracyforward.org
vnugent@democracyforward.org
sperryman@democracyforward.org

Matthew D. Brinckerhoff*
N.Y. Bar No. 2415537
Vasudha Talla*
CA Bar No. 316219
Sana Mayat*
NY Bar No. 5835400
Emery Celli Brinckerhoff Abady Ward & Maazel
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, NY 10020
(212) 763-5000
mbrinckerhoff@ecbawm.com
vtalla@ecbawm.com
smayat@ecbawm.com

*Counsel for Plaintiff*

*Motions for* pro hac vice *admission forthcoming*